EXHIBIT 1

Filed
D.C. Superior Court
09/16/2020 19:20PM
Clerk of the Court

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**

**CIVIL DIVISION**

| | |
|---|---|
| CLEAN LABEL PROJECT FOUNDATION   * <br> A 501(c)(3) <br> 280 E. 1st Ave.   * <br> Broomfield, CO  80038 <br>           * <br> and <br>           * <br> GMO FREE USA d.b.a. TOXIN FREE USA <br> P.O. Box 458   * <br> Unionville, CT  06085 <br>           * <br>      Plaintiffs, <br>      v.   * <br> NOW HEALTH GROUP, INC.   * <br> Serve on:   * <br> James P. Emme <br> 244 Knollwood Drive   * <br> Bloomingdale, IL 60108 <br>           * <br>      Defendant. | Case No. __2020 CA 004013 B__ <br><br> COMPLAINT <br> DEMAND FOR JURY TRIAL |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## __COMPLAINT__

On behalf of themselves and the general public, Plaintiffs, Clean Label Project Foundation ("Clean Label Project" or "CLP") and GMO Free USA d.b.a Toxin Free USA ("Toxin Free USA"), hereinafter Plaintiffs, by and through their counsel, bring this action in the District of Columbia against NOW Health Group, Inc. ("NHG"), hereinafter Defendant, regarding the deceptive labeling, marketing, and sale of  Super Nutrition SimplyOne Prenatal (90 ct), Super Nutrition Prenatal Blend (180 ct), and Super Nutrition SimplyOne Prenatal (30 ct), ("Products")[1] that are under-formulated with respect to folate/folic acid and adulterated with respect to quantifiable amounts of lead, cadmium, and mercury. Contrary to Defendant's promises and assurances, CLP facilitated independent testing and discovered that

---

[1] Discovery may demonstrate that additional NHG Products are within the scope of this Complaint. Plaintiffs reserve the right to amend this complaint to include additional prenatal items identified through the course of discovery.

the amount of folate/folic acid stated on the labels in the Products is under-formulated, well below industry and medical standards (e.g., less than the 400mcg recommended by the American Academy of Pediatricians and World Health Organization). Under-formulation for folate/folic acid increases the risk of miscarriage, still birth, and a host of permanent developmental disabilities. Further, the adulterated Products are exposing mothers and their babies to contaminants, to include: lead, cadmium, and mercury - compounds known to cause reproductive harm in fetuses and infants.  Plaintiffs allege the following based upon information, belief, and the investigation of their counsel:

## Introduction

1. Due to concerns about ensuring the best start for their children, D.C. consumers are increasingly interested in acquiring the cleanest, best nutrition during pregnancy.  This includes taking the cleanest, best, and most accurately-labeled prenatal vitamins during pregnancy.

2. NHG knows that consumers seek out and wish to purchase the cleanest, best, most accurate prenatal vitamins that contain adequate levels of vitamins such as folate/folic acid to ensure proper development for their unborn child and/or fetus and prevent deleterious outcomes such as miscarriage, stillbirth or birth defects.

3. To capture this growing market of 445M, NHG advertises and promotes the Products as:

   a.   "Triple Power Multivitamins"

   b.   "Better birth weight"

   c.   "Reduced Fatigue"

   d.   "Supports Full-Term Birth, Stronger Baby's Bones & Energy All Day"



**Figure 1**        **Figure 2**        **Figure 3**

4. D.C. consumers who seek these labeling claims on the packaging can find further support for these representations on NHG's website, where the brand claims that its Products are "better nutrition."

MAKING THE WORLD A BETTER PLACE THROUGH BETTER NUTRITION IS MORE THAN A SLOGAN, IT'S A MISSION.

Through better nutrition the children of the world can better experience optimal health and more certainly grow into healthy young adults, while adults can enjoy the comfort and peace-of-mind of physical well-being. Through better nutrition we free ourselves from the debilitating shackles of malnourishment, we feel better, we feel happier, we're kinder and gentler-and that makes the world a better place. That's a calling for a company, for a people, for a business ---- called SuperNutrition. To help the world be a little smarter, a little healthier. To build a world concerned not about survival but joyfully thriving. To help build a world of smarter, healthier, happier people. This is what we do, and this is why we do it.

**Figure 4**

5. These claims are false, deceptive, and misleading.  The Products at issue are not safe nor "better nutrition."  The Products contain high levels of neurotoxins lead, cadmium, and mercury, and are under-formulated for folic acid.

6. Lead is a heavy metal and neurotoxin with pervasive effects on early life development. For this reason, the Environmental Protection Agency ("EPA"), Food and Drug Administration, the World Health Organization, the Centers for Disease Control and Prevention, the American Medical Association, and the American Academy of Pediatrics have all independently stated that there is no safe level of lead for children.

   a. The Environmental Protection Agency ("EPA") has stated, "The Maximum Contaminant Level Goal for lead is zero.[2] EPA has set this level based on the best available science, which shows there is no safe level of exposure to lead.[3]

   b. The Food and Drug Administration has stated that "[t]here is no known identified safe blood lead level."[4]

   c. The World Health Organization has likewise stated, "The neurological and behavioral effects of lead are believed to be irreversible. There is no known 'safe' blood lead concentration…."[5]

   d. The Centers for Disease Control have found "[n]o safe blood level of lead has been identified."[6]

---

[2] EPA, *Basic Information about Lead in Drinking Water* (August 13, 2020), https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water#:~:text=EPA%20has%20set%20the%20maximum,in%20the%20body%20over%20time.
[3] *Id.*
[4] Welch, Teresa, *Lead Found in 20% of Baby Food, Report Says* (June 19, 2017), https://www.charlotteobserver.com/news/nation-world/national/article157063044.html.
[5] The World Health Organization, *Lead Poisoning and Health* (Aug. 23, 2019), https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health#:~:text=The%20neurological%20and%20behavioural%20effects,behavioral%20difficulties%20and%20learning%20problems.
[6] CDC, *National Biomonitoring Program, Factsheet* (July 12, 2013), https://www.cdc.gov/biomonitoring/Lead_factsheet.html#:~:text=No%20safe%20blood%20lead%20level,half%20a%20cup%20of%20liquid.).

4

    e.   The American Medical Association has stated, "We know that there is no safe level of lead."[7]

    f.   American Academy of Pediatrics has stated, "There is no safe level of lead exposure in children, with lasting decreases in cognition documented in children with blood levels as low as five micrograms per deciliter of lead in blood."[8]

7.  Cadmium is a toxic heavy metal, known to have severe short- and long-term neurotoxic effects.[9] The European Union has declared cadmium a "Substance of Very High Concern,"[10] and some states, such as Maryland, have banned cadmium in children's products.[11]

8.  Folate/folic acid is a vitamin essential to prenatal development. Improper folate/folic acid intake during pregnancy can result in spontaneous abortion (miscarriage), stillbirth (often before the woman knows she is pregnancy), or one of a host of developmental disabilities collectively referred to as Neural Tube Defects ("NTDs").[12]

9.  The Products in question are:

    a.   Super Nutrition SimplyOne Prenatal (90 ct)

    b.   Super Nutrition Prenatal Blend (180 ct)

---

[7] AMA, *AMA Adopts New Policies to Prevent Future Lead Poisoning* (June 14, 2016), https://www.ama-assn.org/press-center/press-releases/ama-adopts-new-policies-prevent-future-lead-poisoning.

[8] American Academy of Pediatrics, *Lead Exposure in Children*, https://www.aap.org/Pages/ErrorPage.aspx?requestUrl=https://www.aap.org/en-us/advocacy-and-%20policy/aap-health-initiatives/lead-exposure/Pages/Lead-Exposure-in-Children.aspx.

[9] Branca, J. J. V., Morucci, G., & Pacini, A., *Cadmium-induced neurotoxicity: still much ado*, 13(11) Neural regeneration research 1879 (2018).

[10] European Chemicals Agency, Candidate List of Substances for Very High Concern for Authorisation (Aug. 26, 2020), https://echa.europa.eu/candidate-list-table/-/dislist/details/0b0236e1807dd024.

[11] Safer States, *Maryland* (Aug. 26, 2020), https://www.saferstates.com/states-in-the-lead/maryland/.

[12] [12] Blom, H. J., Shaw, G. M., den Heijer, M., & Finnell, R. H, *Neural tube defects and folate: case far from closed*, 7(9) Nature Reviews Neuroscience 724-731 (2006).

      c.   Super Nutrition SimplyOne Prenatal (30 ct)

10. Plaintiffs caused the Products to be purchased for the purpose of evaluation by a private laboratory.  Quantitative testing performed by that laboratory indicated that the Products caused to be purchased by Plaintiffs contained cadmium, lead, mercury, and were under-formulated for folic acid.

11. A comparison of these results to a dataset of over 200 prenatal vitamins revealed that the levels of lead, cadmium, and mercury in the Products are not normal and are many-fold higher than the category average.

12. This testing suggests that neurotoxic contaminants are generally present in the Products, or at a minimum, that NHG makes no efforts to confirm that they are not present.  As a result, D.C. consumers, who are led to believe that the Products support brain development or are "better nutrition," in fact bear the risk of purchasing products that contain meaningful levels of known neurotoxins and are under-formulated for folic acid.

13. A reasonable D.C. consumer would not expect products claiming to support "brain health" to contain high levels of neurotoxins and to be under-formulated for folic acid/folate.[13]

14. In sum, NHG is deceiving D.C. consumers into believing that the Products are properly formulated as to folic acid and "better nutrition", when, in fact, they are adulterated with high levels of toxic metals, and are under-formulated for folic acid/folate.

15. The avoidable presence of these contaminants and under-formulation render the Products adulterated under D.C. Code §48-103 *et seq.*, as the presence of these contaminants constitutes a

---

[13] In a census-balanced survey commissioned by CLP of 630 mothers who took prenatal vitamins during pregnancy, eighty-three percent (83%) felt that they would not have purchased the products if they had discovered it was under-formulated and eighty-four percent (84%) of moms would want their money back.  Clean Label Project, Independent Study of Prenatal Vitamin Consumer Insights (June 25, 2020) (unpublished study) (on file with Clean Label Project).

"poisonous or deleterious substance", and under-formulation constitutes adulteration as folic acid is a "valuable constituent" that has been "omitted or abstracted, in whole or in part."

16. NHG's false and misleading representations and omissions, including any tendency to mislead or omit, and selling of products NHG knows, or should have known, are adulterated, constitute unfair trade practices as defined in D.C. Code § 28-3904 and violate the District of Columbia Consumer Protection Procedures Act ("D.C. CPPA"), D.C. Code §28-3901, *et seq.*

17. Due to the fact NHG's labeling and advertising of the Products tend to mislead and are materially deceptive about the true nature, quality, and ingredients of the Products, Plaintiffs bring this deceptive advertising case on behalf of themselves and the general public, and seek relief, including an injunction to halt NHG's false marketing and sale of the Products.

## Jurisdiction and Venue

18. This Court has personal jurisdiction over the parties in this case.  Plaintiffs, by filing this Complaint, consent to this Court having personal jurisdiction over it and this matter.

19. This Court has personal jurisdiction over Defendant pursuant to D.C. Code §13-423.  Defendant has sufficient minimum contacts with the District of Columbia to establish personal jurisdiction of this Court over them given that, *inter alia,* Defendant is engaged in deceptive schemes and acts directed at persons residing in, located in, or doing business in, the District of Columbia, or otherwise purposefully avails itself of the laws of the District of Columbia through its marketing and sales of the Products in the District of Columbia.

20. This Court has subject matter jurisdiction over this action pursuant to D.C. Code §28-3905(k)(1)(B), (k)(1)(C) and (k)(2).[14]

---

[14] There is no diversity jurisdiction as the amount in controversy does not exceed the federal standard.

## Parties

21. Clean Label Project ("CLP") is a section 501(c)(3) non-profit public interest organization whose mission is to educate the public and enable consumers to make informed shopping choices.

22. CLP performs its work throughout the United States, including in the District of Columbia.

23. CLP uses state-of-the-art laboratory testing to identify the best and worst labeled products and publishes top and bottom performers on its website free of charge.

24. CLP was formed in 2016 with the goal of reducing contamination across all consumer packaged goods.

25. CLP has an interest in food label truth, transparency, and consumers' right to know what is in the products they purchase.  To that end, CLP educates consumers by presenting unbiased science in a straight-forward and useful medium to the public, allowing consumers to make data-based decisions.

26. In 2018, CLP caused the purchasing of the NHG Products, as well as over 200 other prenatal vitamin products in order to evaluate their levels of purity and folic acid.

27. Toxin Free USA is a 501(c)(3) non-profit, public interest organization whose mission is to harness independent science and agroecology concepts to advocate for clean and healthy food and ecological systems. Toxin Free USA educates consumers about the potential hazards of toxic heavy metals, synthetic ingredients, pesticides and biocides, and genetically engineered organisms.

28. Toxin Free USA performs its work throughout the United States, including the District of Columbia.  Toxin Free USA volunteer staff reside in or near the District of Columbia.

29. Toxin Free USA was formed in 2012 with the intent of organizing national boycotts of food

companies that use genetically modified ingredients and related synthetic herbicides and pesticides in their products, and pressuring companies to remove those ingredients.

30. Consequently, Toxin Free USA firmly believes in food transparency.  The organization diligently works to promote food and ecological systems that are clean, accessible and free of contamination.  To that end, Toxin Free USA educates consumers, increasing their awareness and knowledge of toxins used in agricultural production and their effect on health and the environment.

31. Additionally, Toxin Free USA's website, publications, public education, research, network building, and mobilization activities provide an important service to consumers and community activists every month.

32. At all times herein, NHG is an Illinois corporation with its principal place of business in Illinois.

33. Defendant markets and distributes the Products online and in retail stores in the District of Columbia and throughout the United States.

34. Upon information and belief, Defendant has caused harm to the general public of the District of Columbia.

35. Plaintiffs are acting on behalf of the general public as private attorneys pursuant to D.C. Code §28-3905(k)(1)(C)-(D).

36. Plaintiffs are non-profit organizations pursuant to D.C. Code §28-3901(a)(14) and public-interest organizations pursuant to D.C. 28-3901(a)(15).  Plaintiffs are longstanding advocates of the rights of consumers, including but not limited to D.C. consumers, for truthful labeling and marketing.

**The Importance of Folic Acid**

37. Pregnancy can be a high-risk time, with as few as sixty-two percent (62%) of pregnancies ending in a live birth.[15]

38. Gestation, the period of development comprising embryonic and fetal development, is a "critical period" in human life.

39. This critical period is often referred to as "prenatal" development.

40. "Critical periods" are so named because disruption of development during those phases is often irreversible, placing incredible importance on ensuring developing brains and bodies are left unobstructed during these periods.

41. In the case of fetal neurodevelopment, a number of highly important processes occur during even the first month of pregnancy.

42. During the critical periods, essential neurodevelopment occurs, including aspects of neurogenesis – the formation of neurons ("brain cells") and the formation of the complex interconnection of neurons that give rise to the human experience (synaptogenesis).[16]

43. Although the brain continues to develop and change after birth and into adulthood, the prenatal period can have a lasting effect on the adequacy of neurodevelopment and quality of life.

44. How thoroughly a brain develops depends on many factors in addition to genes, such as:[17]

    a.   Proper nutrition starting in pregnancy.

---

[15] Center for Disease Control and Prevention, *US Pregnancy Rate Lowest in Two Decades* (Dec. 15, 1999), https://www.cdc.gov/nchs/pressroom/99facts/pregrate.htm.
[16] Huttenlocher, P. R., & Dabholkar, A. S, *Regional differences in synaptogenesis in human cerebral cortex*, 287(2) Journal of comparative Neurology 167-178 (1997).
[17] Gibbs, B. G., & Forste, R, *Socioeconomic status, infant feeding practices and early childhood obesity*, 9(2) Pediatric obesity 135-146 (2014).

    b.   Exposure to toxins or infections during these critical periods.

    c.   The child's experiences with other people and world after birth.

45. For these reasons, it is critically important to ensure that prenatal development proceeds as smoothly as possible.

46. Thus, it is the duty of brands assisting in this critical prenatal development period to:

    d.   Provide consumers with nutrients needed to ensure proper development.

    e.   Ensure that the brand's products do not provide deleterious chemicals that may detract from healthy development.

47. One such critical process is the folding of the neural crest into the neural tube: when a flat layer of specialized cells in the embryo "folds" and seals shut, eventually creating a cylinder of cells that will grow to become the central nervous system (the brain and spine).[18]

48. If this sealing process or one of its immediate consequences, which occurs during the third week of pregnancy, is unsuccessful, the child will develop one of a host of complications cumulatively referred to as Neural Tube Defects ("NTDs").

49. These NTDs take many forms, but all involve some form of disruption of central nervous system functioning – ranging from lower limb paralysis (*spina bifida)* to the child being born without a brain (*anencephaly)*. Many NTDs are fatal, often resulting in nonviable pregnancy or still birth.[19]

50. Roughly half of all spontaneous abortions (miscarriages) are related to environmental factors,[20] to include NTDs induced by insufficient dietary folate/folic acid.[21]

---

[18] Blom, H. J., Shaw, G. M., den Heijer, M., & Finnell, R. H, *Neural tube defects and folate: case far from closed*, 7(9) Nature Reviews Neuroscience 724-731 (2006).

[19] *Id*.

[20] Cramer DW, Wise LA. The epidemiology of recurrent pregnancy loss. Semin Reprod Med. 2000;18:331–9.

[21] George, L., Mills, J. L., Johansson, A. L., Nordmark, A., Olander, B., Granath, F., & Cnattingius, S. (2002). Plasma folate levels and risk of spontaneous abortion. Jama, 288(15), 1867-1873.

51. While many factors play a role in the development of NTDs, proper nutrition is critical in reducing risk.

52. Specifically, ensuring adequate maternal intake of vitamin B9 (folate/folic acid) is essential in reducing the risk of NTDs.

53. Vitamin B9 (Folate) is an essential vitamin that plays a critical role in the development of DNA.

54. The synthetic form of folate most commonly used in supplements is folic acid.[22]

55. Fortification with folic acid has been linked to reductions in the incidence of several NTDs.[23]

56. The consequences of improper folic acid fortification can be severe and can include loss of life for the child so impacted.

57. Newborns with anencephaly, an NTD in which some or all of the brain fails to form, usually do not live long, and those with spina bifida may be permanently disabled.

58. NTDs can be avoided with proper folate/folic acid intake during pregnancy.

59. NTDs linked to folate/folic acid-insufficiency have been referred to as an "unnecessary epidemic."[24]

60. Improper prenatal folate/folic acid intake has been linked to increased risk of spontaneous abortion (miscarriage) or still birth, with up to forty-eight percent (48%) of NTD-affected pregnancies ending in a spontaneous abortion.[25]

---

[22] Center for Disease Control, *Folic Acid* (April 11, 2018), https://www.cdc.gov/ncbddd/folicacid/about.html.
[23] Centers for Disease Control and Prevention (CDC), *Spina bifida and anencephaly before and after folic acid mandate--United States, 1995-1996 and 1999-2000*, MMWR, 53(17) Morbidity and Mortality Weekly Report 362 (2004).
[24] Brent, R. L., Oakley, G. P., & Mattison, D. R., *The unnecessary epidemic of folic acid-preventable spina bifida and anencephaly*, 106(4) Pediatrics 825-827 (2000).
25 Carmi R, Gohar J, Meizner I, Katz M. Spontaneous abortion--high risk factor for neural tube defects in subsequent pregnancy. Am J Med Genet. 1994;51(2):93-97. doi:10.1002/ajmg.1320510203

61. Roughly one third of pregnancies are lost prior to birth[26] and as many as fifty percent (50%) of these pregnancies are lost due to environmental factors,[27] including NTDs and other complications brought on by insufficient folate/folic acid intake.

62. Worse, the effects of a spontaneous abortion can carry over to the next pregnancy, with peer-reviewed research suggesting spontaneous abortion increases the risk of an NTD in the subsequent pregnancy, even when folic acid supplementation is statistically controlled.[28] This means the effects of under-supplementation with folic acid can cascade beyond the specific pregnancy.

63. Peer-reviewed research has demonstrated that folate/folic acid supplementation during pregnancy can reduce the risk of spontaneous abortion or still birth.[29]

64. For this reason, supplementing with folate/folic acid is an important step in prenatal neurodevelopment.

65. Unfortunately, in many cases it is difficult or impossible for women to attain sufficient folate/folic acid in their diets to minimize their fetuses' risk of an NTD or subsequent deleterious outcome, to include spontaneous abortion or still birth.[30]

66. The CDC recommends women start taking folic acid every day for at least a month before becoming pregnant, and every day while pregnant.[31]

---

[26] Wilcox AJ, Weinberg CR, O'Connor JF, Baird DD, Schlatterer JP, Canfield RE, et al. Incidence of early loss of pregnancy. N Engl J Med. 1988;319:189–94.

[27] Cramer DW, Wise LA. The epidemiology of recurrent pregnancy loss. Semin Reprod Med. 2000;18:331–9.

[28] Todoroff, K., & Shaw, G. M. (2000). Prior spontaneous abortion, prior elective termination, interpregnancy interval, and risk of neural tube defects. American journal of epidemiology, 151(5), 505-511.

[29] Gaskins, A. J., Rich-Edwards, J. W., Hauser, R., Williams, P. L., Gillman, M. W., Ginsburg, E. S., ... & Chavarro, J. E. (2014). Maternal prepregnancy folate intake and risk of spontaneous abortion and stillbirth. Obstetrics and gynecology, 124(1), 23.

[30] Healthy Children.org, *Where We Stand: Folic Acid* (Nov. 2019), https://www.healthychildren.org/English/ages-stages/prenatal/Pages/Where-We-Stand-Folic-Acid.aspx.

[31] WebMD, *Folic Acid and Pregnancy*, https://www.webmd.com/baby/folic-acid-and-pregnancy#1.

67. The recommended dose for all women of childbearing age is 400 mcg of folate/folic acid each day.[32]

68. However, the CDC recommends women who have already had an NTD-affected pregnancy consume 400 mcg of folic acid each day, even when not planning to become pregnant. When planning to become pregnant, the CDC recommends that these women consume 4,000 mcg of folic acid each day, one month before becoming pregnant, and through the first three months of pregnancy.[33]

69. Studies have confirmed that getting an adequate amount of folic acid will protect the fetus/infant from NTDs by at least fifty percent (50%).[34]

70. According to the CDC, for women who have already had a baby with an NTD, getting enough folic acid may reduce the risk of having another child with an NTD by as much as seventy percent (70%).[35] This in turn reduces the risk of an NTD-linked spontaneous abortion or still-birth.

71. The American Academy of Pediatrics ("AAP") has stated that "all women capable of becoming pregnant consume 400 micrograms per day of folic acid." Furthermore, "[a]lthough some foods are fortified with folic acid, it is not possible for women to meet the 400 mcg goal through a typical diet."

72. The AAP policy statement recommends a daily multivitamin tablet that contains folic acid in the recommended dose. Studies show that if all women of childbearing age met these dietary requirements, fifty percent (50%) or more of NTDs could be prevented.[36]

---

[32] CDC, *Folic Acid* (April 11, 2018), https://www.cdc.gov/ncbddd/folicacid/about.html.
[33] Center for Disease Control and Prevention, *Effectiveness in Disease and Injury Prevention Use of Folic Acid for Prevention of Spina Bifida and Other Neural Tube Defects -- 1983-1991* (Aug. 2, 1991), https://www.cdc.gov/mmwr/preview/mmwrhtml/00014915.htm.
[34] CDC, *Preventing Neural Tube Defects: A prevention Model Resource Guide* (July 17, 2020), https://www.cdc.gov/ncbddd/orders/PDFs/09_202063A_Nash_Neural%20Tube%20BD%20Guide%20FINAL508.pdf%20(wed).
[35] Healthy Children.org, *Where We Stand: Folic Acid,* https://www.healthychildren.org/English/ages-stages/prenatal/Pages/Where-We-Stand-Folic-Acid.aspx.
[36] *Id.*

73. Thus, ensuring adequate folate/folic acid intake is one of the principal purposes of a prenatal vitamin. Taking a prenatal vitamin with inadequate folate/folic acid increases the risk of spontaneous abortion, stillbirth, or NTDs such as spina bifida.

74. Therefore, under-formulation for folic acid renders a prenatal vitamin adulterated under D.C. Code §48-103 *et seq*, and selling products so-adulterated constitutes an unlawful trade practice as defined in D.C. Code § 28-3904.

75. Further, it follows that marketing a product as a "prenatal vitamin" when it doesn't contain an adequate amount of folic acid is false and misleading under D.C. Code §28-3904 *et seq.*, as the brand has represented the Products as "… a particular standard, quality, grade, style, or model" when they do not adequately fulfill the intended purpose of that standard, style, or model.

### The Dangers of Heavy Metals: Lead, Cadmium and Mercury

#### Dangers of Lead

76.  Lead is a heavy metal and a known carcinogen and neurotoxin. Lead resembles other metals that the human body needs to properly function, and as such, it is readily absorbed into body tissue.[37]

77. Lead readily crosses the placenta, impacting embryonic and fetal development.[38]

78. Lead can damage and/or destroy cells once in the body: it also remains in the body for an extended period of time, causing even greater extent to the damage.[39]

79. Specifically, lead damages the myelin sheaths of neurons (protective insulation essential for

---

[37] Wani, A.L., Ara, A., & Usmani, J.A., *Lead toxicity: a review*, 8(2) Interdisciplinary toxicology 55-64 (2015), https://www.ncbi.nlm.nih.gov/PLC/articles/PMC4961898.
[38] Foltinova, J., Foltin, V., & Neu, E., *Occurrence of lead in placenta–important information for prenatal and postnatal development of child*, 28(4) Neuroendocrinology Letters 335-340 (2007).
[39] *Id.*

proper neuronal functioning)[40] and interferes with neurotransmission (the communication

between neurons),[41] both of which are potentially disastrous for human cognition & development.

80. Lead also interferes with the levels of brain derived neurotrophic factor ("BDNF") – an important

neuroprotective molecule that plays a principal role in neurodevelopment, specifically

neurogenesis.[42]

81. One mechanism behind the benefits of DHA supplementation (discussed above) is upregulation

of BDNF in the brain.[43]

82. Thus, prenatal lead exposure has known adverse effects on maternal health and infant outcomes

across a wide range of maternal blood lead levels.

83. A principal risk of prenatal exposure to lead is a reduction in intelligence, with experts

demonstrating a direct relationship between childhood blood-lead levels and intelligence quotient

(IQ).[44]

84. The consequences of even low-level (part-per-billion) exposure can be severe:

---

[40] Dabrowska-Bouta, B., Sulkowski, G., Bartosz, G., Walski, M., & Rafalowska, U., *Chronic lead intoxication affects the myelin membrane status in the central nervous system of adult rats*, 127-139 Journal of Molecular Neuroscience 127-139 (1999).
[41] Neal, A. P., & Guilarte, T. R., *Molecular neurobiology of lead (Pb 2+): effects on synaptic function*, 42(3) Molecular neurobiology 151-160 (2010).
[42] Bradbury, J., *Docosahexaenoic acid (DHA): an ancient nutrient for the modern human brain*, 3(5) Nutrients 529-554 (2011).
[43] *Id.*

[44] COUNCIL ON ENVIRONMENTAL HEALTH,  138:e20161493 *Pediatrics* (2016).



**Figure 5**

85. In Flint, Michigan, following city-wide exposure to part-per-billion levels of lead in drinking water, the portion of Flint's third graders who tested as proficient in reading at grade level fell from 41.8% to 10.7%.[45]

86. As discussed above, the Environmental Protection Agency, Food and Drug Administration, the World Health Organization, Centers for Disease Control and Prevention, the American Medical Association, and the American Academy of Pediatrics have all independently stated that there is no safe level of lead for children.

87. Thus, by its very nature, the presence of lead in prenatal vitamins is antithetical to a mission to support brain health, as the presence of lead in prenatal vitamins is a "deleterious substance which may render it injurious to health…" under D.C. Code §48-103 *et seq.*

**Dangers of Cadmium**

88. Cadmium is also a heavy metal and a known neurotoxin and an International Agency for

---

[45] Grossman, Slusky, *The Effect of an Increase in Lead in the Water System on Fertility and Birth Outcomes: The Case of Flint, Michigan,* http://www2.ku.edu/~kuwpaper/2017Papers/201703.pdf.

Research on Cancer ("IARC") class 1 carcinogen, known for having both short-term and long-term deleterious effects on human health.

89. Cadmium readily crosses the placenta, accumulating in fetal or embryonic tissue.[46]

90. Once absorbed, cadmium has a long half-life in the body, especially in the kidneys. Chronic cadmium exposure has been shown to adversely affect kidney and bone and to increase the risk of cancer.  Cadmium also functions as an endocrine disruptor and may thus affect reproduction and child neurodevelopment.[47]

91. Specifically, cadmium impairs brain health through multiple pathways, including the interruption of DNA repair, the generation of reactive oxygen species, and, most critically, the disruption of neuronal proliferation and differentiation – two steps in the neurogenesis process occurring during the infancy critical period.[48]

92. Therefore, early life exposure to cadmium is associated with poor cognitive outcomes in children.[49]

93. Cadmium also interferes with the levels of BDNF.[50]

94. One mechanism behind the benefits of DHA supplementation (discussed above) is upregulation of BDNF in the brain.[51] Thus, the presence of cadmium detracts from a principal function of

---

[46] Gundacker C, Hengstschläger M. *The role of the placenta in fetal exposure to heavy metals.* Wien Med Wochenschr. 2012;162(9-10):201-206. doi:10.1007/s10354-012-0074-3
[47] Kippler, M., Tofail, F., Gardner, R., Rahman, A., Hamadani, J. D., Bottai, M., & Vahter, M., *Maternal cadmium exposure during pregnancy and size at birth: a prospective cohort study*, 120(2) Environmental Health Perspectives 284–289 (2012), https://doi.org/10.1289/ehp.1103711.
[48] Branca, J. J. V., Morucci, G., & Pacini, A., *Cadmium-induced neurotoxicity: still much ado*, 13(11)Neural regeneration research 1879 (2018).
[49] Sanders, A. P., Henn, B. C., & Wright, R. O., *Perinatal and childhood exposure to cadmium, manganese, and metal mixtures and effects on cognition and behavior: a review of recent literature*, 2(3) Current environmental health reports 284-94 (2015).
[50] Bradbury, J., *Docosahexaenoic acid (DHA): an ancient nutrient for the modern human brain*, 3(5) Nutrient*s* 529-554 (2011).
[51] *Id.*

DHA – a basis NHG's "brain development" claims.

95. This cadmium-mediated disruption of neuro-development renders NHG's Products adulterated under D.C. Code §48-103 *et seq* as brain development is a marketed benefit of NHG Products.

96. In general, women are more susceptible to cadmium toxicity, mainly because of increased intestinal uptake of cadmium given low iron stores, which are more prevalent in women than in men.[52]

97. Worse, cadmium has been shown to accumulate in in placental tissues, where it interrupts micronutrients (such as zinc) diffusion through the placenta.[53]

98. Thus, scientific evidence demonstrates that cadmium directly interferes with NHG Products as the presence of cadmium in prenatal vitamins is a "deleterious substance which may render it injurious to health…."[54]

**<u>Dangers of Mercury</u>**

99. Mercury is a heavy metal and a known neurotoxin.

100. Mercury is one of the most toxic substances on the planet, with no safe level of exposure. It has been established that mercury can pass through the blood brain barrier and accumulate in the brain.[55]

101. Mercury is highly toxic to human health, posing a particular threat to the development of the

---

[52] *Id.*
[53] Kippler, M., Hoque, A. W., Raqib, R., Öhrvik, H., Ekström, E. C., & Vahter, M., *Accumulation of cadmium in human placenta interacts with the transport of micronutrients to the fetus*, 192(2) Toxicology Letters 162-168 (2010).
[54] D.C. Code §48-103 *et seq*.
[55] Bose-O'Reilly S, McCarty K, Steckling N, Lettmeier B, *Mercury Exposure and Children's Health Current Problems in Pediatric and Adolescent Healthcare* (2011).

child in utero and early in life.[56]

102.  Neurological and behavioral disorders may be observed after inhalation, ingestion, or dermal application of different mercury compounds. Symptoms include: tremors, insomnia, memory loss, neuromuscular effects, headaches, and cognitive and motor dysfunction.[57]

103.  Mercury has a significant effect on neurological function.  In 2010, a team of academic researchers from the United States and Germany conducted a comprehensive review of studies already completed on Mercury and its neurological effects. They reported, "Thirty-two studies, out of forty testing memory in individuals exposed to mercury, found significant memory deficits."[58]

## **Factual Allegations**

104.   NHG is aware that there are health risks associated with pregnancy.

105.  NHG is aware of the dangers of heavy metal toxins and other contaminants during pregnancy.

106.  NHG is aware there is a market for pregnancy supplements to support healthy pregnancy for the development of the fetus.

107.  To capture this market, NHG manufactures, produces, and distributes vitamins for the purpose of supporting a healthy pregnancy.

108.  Given the above, it follows that, NHG is aware that consumers are concerned with the contents of their supplements.

---

[56] The World Health Organization, *Preventing Disease Through Healthy Environments; Exposure to Mercury: A Major Public Health Concern*, https://www.who.int/phe/news/Mercury-flyer.pdf.
[57] *Id.*
[58] Mutter J, Curth A, Naumann J, Deth R, Walach H., *Does Inorganic Mercury Play a Role in Alzheimer's Disease?*, Journal of Alzheimer's Disease (2010), https://pubmed.ncbi.nlm.nih.gov/20847438/.

109.   NHG is also aware that consumers seek supplements for specific health reasons.

110.   Further, NHG is aware that the consumers who seek out prenatal vitamins are a vulnerable group of consumers to whom such products' contents are of a heightened importance.

111.   NHG's Products are under-formulated as to folic acid; thus, consumers who take the Product for specific advertised health purposes are not getting the proper dosage.  The results of this under-formulation are life threatening.

112.   NHG's Products are adulterated and contain quantifiable amounts of heavy metals which are harmful if exposed to both mothers and babies during the prenatal process.

113.   NHG's marketing practices are false and misleading as they extoll the brain-supporting feature of the Products while exposing infants and fetuses to concerning levels of known neurotoxins for which there is no established safe level.

114.   NHG's Products are adulterated under D.C. Code §48-103 et seq., as the presence of these contaminants renders them unsafe for their intended population, and the presence of these contaminants directly contradicts the intended brain-support benefit of the Products.

### NHG's Marketing is Unconscionably Misleading and Omits Material Facts

115.   To capture the market for prenatal vitamins and supplements, NHG markets its Products as "Science Validated":



SCIENCE

SCIENTIFICALLY VALIDATED POTENCIES It started with a formula created by SuperNutrition. One based on the latest science, one that was balanced and effective, one that reflected the high-potency theories of Linus Pauling and the cellular nutrition theories of Richard Passwater.

**Figure 6**

116.   NHG also promises "peace of mind" and "physical well-being" through "better nutrition."

MAKING THE WORLD A BETTER PLACE THROUGH BETTER NUTRITION IS MORE THAN A SLOGAN, IT'S A MISSION.

Through better nutrition the children of the world can better experience optimal health and more certainly grow into healthy young adults, while adults can enjoy the comfort and peace-of-mind of physical well-being. Through better nutrition we free ourselves from the debilitating shackles of malnourishment, we feel better, we feel happier, we're kinder and gentler and that makes the world a better place. That's a calling for a company, for a people, for a business — called SuperNutrition. To help the world be a little smarter, a little healthier. To build a world concerned not about survival but joyfully thriving. To help build a world of smarter, healthier, happier people. This is what we do, and this is why we do it.

**Figure 7**

117.   NHG promises it's "comprehensive, high-potency multivitamins" offer "unequaled value."

Our Promise:

* Comprehensive, high-potency multivitamins for the whole family, including targeted formulas based on need.
* Unequaled value.
* Chewable formulas you will love!

**Figure 8**

118.   NHG makes multiple promises about what is contained in the Products, namely folic acid, as noted above.

## Supplement Facts

Serving Size 1 Tablet

| | Amount Per Serving | % DV |
|---|---|---|
| Vitamin A (as retinol palmitate, 17% (1000 IU) as beta-carotene) | 6000 IU | 120% |
| Vitamin C (ascorbic acid) | 150 MG | 250% |
| Vitamin D (as vitamin D3) | 3000 IU | 750% |
| Vitamin E (as d-alpha tocopheryl succinate) | 100 IU | 333% |
| Vitamin K (as phytonadione) | 80 MCG | 100% |
| Thiamine (vitamin B1) | 40 MG | 2667% |
| Riboflavin (vitamin B2) | 30 MG | 1765% |
| Niacin (as niacin**, niacinamide) | 40 MG | 200% |
| Vitamin B6 (as pyridoxine HCl) | 35 MG | 1750% |
| Folic Acid | 1000 MCG | 250% |
| Vitamin B12 (as methylcobalamin) | 150 MCG | 2500% |
| Biotin (as d-biotin) | 330 MCG | 110% |
| Pantothenic Acid (as d-calcium pantothenate) | 35 MG | 350% |
| Calcium (as calcium carbonate, calcium citrate) | 110 MG | 11% |
| Iron (as ferrous carbonyl)*** | 30 MG | 167% |
| Iodine (from kelp) | 290 MCG | 193% |

| | Amount Per Serving | % DV |
|---|---|---|
| Magnesium (as magnesium oxide, magnesium glycinate) | 60 MG | 15 % |
| Zinc (as zinc oxide, zinc citrate) | 32 MG | 213 % |
| Selenium (as sodium selenite) | 225 MCG | 321 % |
| Copper (as copper glycinate) | 2 MG | 100 % |
| Manganese (as manganese sulfate) | 5 MG | 250 % |
| Chromium (as chromium picolinate)*** | 225 MCG | 188 % |
| Molybdenum (as molybdenum trioxide) | 80 MCG | 107 % |
| Betaine (as betaine HCl) | 25 MG | * |
| Bioflavonoids (from lemon fruit) | 25 MG | * |
| Boron | 2 MG | * |
| Choline (as choline bitartrate) | 15 MG | * |
| Glutamic Acid (as glutamic acid HCl) | 5 MG | * |
| Hesperidin (from citrus) | 5 MG | * |
| Inositol | 15 MG | * |
| Rutin | 5 MG | * |
| **Whole Food & Herb Blend** | **50 MG** | * |
| Papaya Fruit, Alfalfa leaf #, Spirulina herb #, Chlorella herb # | | |

*Daily Value (DV) Not Established

**Other Ingredients:** Microcrystalline Cellulose, Croscarmellose Sodium, Magnesium Stearate (Vegetable Source), Stearic Acid (Vegetable Source), Vegetable-Based Coating, Natural Vanilla.          # Certified Organic

**Figure 9**

119.   NHG's promises of folic acid on its packaging, website, and marketing give consumers a false expectation that the Product possess a properly formulated serving of folic acid.

120.   The Products are under-formulated as to folic acid, well below the promises made on the packaging and website and well below medically recommended dosage of 400mcg of folate daily.

121.   In addition to the under-formulation, NHG's Products are also adulterated and contain quantifiable amounts of heavy metals.

122.    These heavy metal toxins are not listed, labeled, or advertised and have extreme negative health effects on both mother and fetus:

    a.   Lead

    b.   Cadmium

    c.   Mercury

123. Consumers who seek out and purchase the Products do not expect them to be under-formulated, or even worse, contain toxic heavy metals.

124. Moreover, consumers would not purchase the Products made solely for the supplementation of healthy prenatal process if they knew it contained ingredients that could in fact encourage the exact opposite.

## The Under-Formulation of the Products

125. CLP caused the purchase of the Products for the purposes of testing in the fall of 2018 and shipped the Products to the laboratory in the fall of 2018.

126. In the winter of 2018, quantitative testing was performed by an independent ISO-17025 accredited, analytical chemistry laboratory on samples of the Products caused to be purchased by Plaintiffs, as well as over two-hundred (200) other samples of prenatal vitamins.

127. The testing was conducted via a blinded methodology to fully protect impartiality. All prenatal vitamins, to include Defendant's Products, were sampled out into conical tubes and numbered. The Products' names and corresponding numbers were maintained exclusively by CLP to protect independence and confidentiality.

128. As a result of the quantitative testing, the sample of Defendant's Products yielded a folic acid content of the following:

   a.   Super Nutrition SimplyOne Prenatal (90 ct):

      i.   Claimed amount: 1000mcg/serving

      ii.   Testing results: 648.7mcg/serving

## The Presence of Quantifiable Amounts of Heavy Metals in the Products

129.   CLP caused the purchase of the Products for the purposes of testing in the fall of 2018 and

shipped the Products to the laboratory in the fall of 2018.

130. In the winter of 2018, quantitative testing was performed by an independent ISO-17025 accredited, analytical chemistry laboratory on samples of the Products caused to be purchased by Plaintiffs as well as over two-hundred (200) other samples of prenatal vitamins.

131. The testing was conducted via a blinded methodology to fully protect impartiality.  All prenatal vitamins, to include Defendant's Products, were sampled out into conical tubes and numbered. The Products' names and corresponding numbers were maintained by CLP to protect independence and confidentiality.

132. The results are in parts-per-billion (ppb):

   a.   Super Nutrition SimplyOne Prenatal (90 ct):

        i.   As a result of the quantitative testing, the sample of Defendant's Product yielded a lead content 125.11ppb, which on a per-serving basis is higher than 56.6% of other prenatal vitamins tested.

        ii.  As a result of the quantitative testing, the sample of Defendant's Product yielded a cadmium content of 150.51ppb, which on a per-serving basis is higher than 78.8% of other prenatal vitamins tested.

   b.   Super Nutrition Prenatal Blend (180 ct):

        i.   As a result of the quantitative testing, the sample of Defendant's Product yielded a lead content of 68.27ppb, which on a per-serving basis is higher than 89.6% of other prenatal vitamins tested.

        ii.  As a result of quantitative testing, the sample of Defendant's Product yielded a cadmium content of 130.8ppb, which on a per-serving basis is higher than 96.5%

of other prenatal vitamins tested.

   c.  Super Nutrition SimplyOne Prenatal (30 ct):

      i.  As a result of the quantitative testing, the sample of Defendant's Product yielded a lead content of 143.49ppb, which on a per-serving basis is higher than 62.5% of other prenatal vitamins tested.

     ii.  As a result of the quantitative testing, the sample of Defendant's Product yielded a cadmium content of 231.57ppb, which on a per-serving basis is higher than 88.6% of other prenatal vitamins tested.

    iii.  As a result of quantitative testing, the sample of Defendant's Product yielded a mercury content of 12.87ppb, which on a per-serving basis is higher than 85.2% of other prenatal vitamins tested.

**<u>NHG Knew or Should Have Known its Representations Were False</u>**

133.  NHG holds itself out to the public as a trusted source of prenatal supplements and vitamins.

134.  NHG knew or should have known what representations it made regarding the Products (as noted above). NHG also knew or should have known how its Products were sourced, processed, and marketed.

135.  NHG knew, or should have known, the facts demonstrating that the Products were mislabeled, falsely advertised, and adulterated.

136.  D.C. consumers rely on label representations and marketing information in making purchase decisions.

137.  NHG made false, misleading, and deceptive representations and omissions intending for D.C.

consumers to rely upon those representations and omissions in purchasing the Products.

138. NHG knows that D.C. consumers seek out prenatal vitamin supplements that these consumers believe to be properly formulated and not adulterated.

139. Upon information and belief, NHG has failed to remedy the problem with the Products, causing ongoing harm to D.C. consumers.

140. D.C. consumers are at risk of real, immediate, and continuing harm if the Products continue to be sold with misleading and/or deceptive representations or omissions.

141. Reasonable consumers do not expect products represented and advertised as a prenatal vitamin to be adulterated and to contain toxic heavy metals that are dangerous and adverse to the prenatal process and undermine the very purpose of the products.

**Cause of Action: Violation of the District of Columbia Consumer Protection Procedures Act**

142. Pursuant to D.C. Code §28-3905(k)(1) and 28-39905(k)(2), the Clean Label Project ("CLP") brings this claim on behalf of itself and the general public of the District of Columbia, for NHG's violation of the District of Columbia Consumer Protection Procedures Act, D.C. Code §28-3901 *et seq.*

143. Plaintiffs incorporate by reference all allegations in the preceding paragraphs of this Complaint.

144. NHG labeled and advertised the Products as containing 1000mcg/serving of folic when in fact they are under-formulated and contain less than labeled and advertised.

145. NHG adulterated the Products as the presence of heavy metals impairs the neurological development of the fetus, which is the purpose of the prenatal vitamin.

146. NHG's advertising of the Products misrepresents, tends to mislead regarding material facts, and omits facts regarding: the source, characteristics, standard, qualities, or grades that NHG states

and implies.

147. The Products lack the characteristics, ingredients, benefits, standards, qualities, or grades that NHG states and implies.

148. NHG's misstatements, innuendo, and omissions of material fact are material and have the tendency to mislead.

149. NHG knowingly did not sell the Products as advertised.

150. The facts as alleged above demonstrate that NHG has violated the CPPA, D.C. Code §28-3901 *et seq.*

151. NHG's conduct is unlawful trade practice "whether or not any consumer is in fact mislead, deceived or damaged thereby." D.C. Code §28-3904.

152. CLP has a sufficient nexus to D.C. consumers of the Products to adequately represent their interests.

153. Given that NHG misrepresents the characteristics, ingredients, and benefits of the Products; misrepresents the standard, quality, and grade of the Products; misrepresents, fails to state, and uses innuendo and ambiguity in ways which tend to mislead reasonable consumers with regard to material facts about the Products; advertises the Products without the intent to sell the Products as advertised; and has adulterated the Products, NHG's  marketing of the Products violates D.C. Code §28-3901 *et seq.*

154. Specifically, NHG has violated D.C. Code §28-3904, which makes it an unlawful trade practice to:

    a.   represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;

…

d.  represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

e.  misrepresent as to a material fact which has a tendency to mislead; …

f.  fail to state a material fact if such failure tends to mislead

f-1. [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead; … [or]

h.  advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered.

155.  Additionally, NHG has violated D.C. Code §28-3904 *et seq,* pursuant to the definition of "Adulterated," as defined in D.C. Code §48-103 as the presence of these contaminants render the products "injurious to health."

156.  NHG is a "person" within the meaning of D.C. Code §28-3901(a)(1), is a merchant under D.C. Code §29-3901(a)(3), and provides "goods" within the meaning of D.C. Code §28-3901(a)(7).

157.  Pursuant to D.C. Code §28-3905(1)(C), "[a] nonprofit organization may, on behalf of itself or any of its members, or on any such behalf and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District of Columbia, including a violation involving consumer goods or services that the organization purchased or received in order to test or evaluate qualities pertaining to use for personal, household, or family purposes."

158.  CLP is a nonprofit organization pursuant to D.C. Code §28-3905(k)(1)(C) that caused the Products to be purchased in order to test or evaluate their qualities.

29

159. Pursuant to D.C. Code §28-3905(k)(1)(D)(i), "public interest organizations may, on behalf of the interests of a consumer or class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action under subparagraph (A) of this paragraph for relief from such use by such person or such trade practice."

160. The only limitation on this power of a public interest organization to act on behalf of consumers is that the public interest organization must have "sufficient nexus to the interests involved of the consumer or class to adequately represent those interests."[59]

161. As set forth in this Complaint, Plaintiffs were founded with the shared purpose of advocating for and educating consumers, including consumers in the District of Columbia, in the arena of clean and healthy food and ecological systems. Plaintiffs' shared mission is to bring truth and transparency to food and consumer products labeling. In addition, Plaintiffs have retained the undersigned competent counsel, to pursue this action, and Plaintiffs have previously represented District consumers in similar actions under the D.C. CPPA.

162. Plaintiffs are a public-interest organization pursuant to D.C. Code §28-3905(k)(1)(D) and bring this action on behalf of members of the general public who could bring the action under D.C. Code §28-3905(k)(1)(A).

163. Section 28-3905(k)(1)(D)(i) of the CPPA allows for non-profit organizational standing and public interest organizational standing to the fullest extent recognized by D.C. Court of Appeals in its past and future decisions addressing the limits of constitutional standing under Article III.

164. Plaintiffs are a "person" within the meaning of D.C. Code §28-3901(a)(1), a "non-profit

---

[59] D.C. Code §28-3905(k)(1)(D)(ii).

organization" within the meaning of D.C. Code §28-3901(a)(14), and a "public interest organization" within the meaning of D.C. Code §28-3901(a)(15).

### Prayer for Relief

**WHEREFORE,** Plaintiffs pray for judgment against Defendant including the remedies available under D.C. Code §28-3905(k)(2)(A-F):

A. A Declaration that Defendant's conduct is in violation of the D.C. CPPA.

B. An Order enjoining Defendant's conduct found to be in violation of the D.C. CPPA.

C. An Order requiring Defendant to provide corrective advertising to the residents of the District of Columbia that restores consumers.

D. An Order granting Plaintiffs' costs and disbursements, including reasonable attorneys' fees and expert fees, and prejudgment interest at the maximum rate allowable by law.

### Jury Trial Demanded

Plaintiffs Clean Label Project and Toxin Free USA hereby demand a trial by jury.

Dated: 9/15/2020

Respectfully submitted,

Attorneys for Clean Label Project (CLP) and Toxin Free USA

/s/ Travis Pittman
Travis Pittman (D.C. Bar No. 1016894)
Local Counsel for Plaintiffs
Holmes Pittman & Haraguchi, LLP
P.O. Box 380
Chester, MD  21619
Phone: (410) 482-9505
Fax: (443) 782-0362
jtpittman@hphattorneys.com

Kristen M. Ross, Esq. (MD Bar No. 0712120212)
Davitt, Lalley, Dey & McHale, PC
1971 Beltline Ave., Suite 106
Grand Rapids, MI 49525
Tel: (202) 750-0355
kristen.ross@dldmlaw.com

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

CLEAN LABEL PROJECT FOUNDATION   Case Number: ___**2020 CA 004013 B**___

and GMO FREE USA d.b.a. TOXIN FREE USA
vs                              Date: 9/16/2020

NOW HEALTH GROUP, INC.   ☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)*<br>J. Travis Pittman | Relationship to Lawsuit<br>☒ Attorney for Plaintiff |
| Firm Name:<br>Holmes Pittman & Haraguchi, LLP | ☐ Self (Pro Se) |
| Telephone No.:            Six digit Unified Bar No.:<br>(202) 329-3558            1016894 | ☐ Other: _____ |

TYPE OF CASE:   ☐ Non-Jury      ☐ 6 Person Jury      ☒ 12 Person Jury
Demand: $_____      Other: __Declaratory Judgment_____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED
Case No.: __N/A_____      Judge: _____      Calendar #:_____

Case No.:_____      Judge: _____      Calendar#:_____

---

**NATURE OF SUIT:**      *(Check One Box Only)*

**A. CONTRACTS**                    **COLLECTION CASES**

| | | |
|---|---|---|
| ☐ 01 Breach of Contract | ☐ 14 Under $25,000 Pltf. Grants Consent | ☐ 16 Under $25,000 Consent Denied |
| ☐ 02 Breach of Warranty | ☐ 17 OVER $25,000 Pltf. Grants Consent | ☐ 18 OVER $25,000 Consent Denied |
| ☐ 06 Negotiable Instrument | ☐ 27 Insurance/Subrogation | ☐ 26 Insurance/Subrogation |
| ☐ 07 Personal Property | Over $25,000 Pltf. Grants Consent | Over $25,000 Consent Denied |
| ☐ 13 Employment Discrimination | ☐ 07 Insurance/Subrogation | ☐ 34 Insurance/Subrogation |
| ☐ 15 Special Education Fees | Under $25,000 Pltf. Grants Consent | Under $25,000 Consent Denied |
| | ☐ 28 Motion to Confirm Arbitration | |
| | Award (Collection Cases Only) | |

**B. PROPERTY TORTS**

| | | |
|---|---|---|
| ☐ 01 Automobile | ☐ 03 Destruction of Private Property | ☐ 05 Trespass |
| ☐ 02 Conversion | ☐ 04 Property Damage | |
| ☐ 07 Shoplifting, D.C. Code § 27-102 (a) | | |

**C. PERSONAL TORTS**

| | | |
|---|---|---|
| ☐ 01 Abuse of Process | ☐ 10 Invasion of Privacy | ☐ 17 Personal Injury- (Not Automobile, Not Malpractice) |
| ☐ 02 Alienation of Affection | ☐ 11 Libel and Slander | ☐ 18 Wrongful Death (Not Malpractice) |
| ☐ 03 Assault and Battery | ☐ 12 Malicious Interference | ☐ 19 Wrongful Eviction |
| ☐ 04 Automobile- Personal Injury | ☐ 13 Malicious Prosecution | ☐ 20 Friendly Suit |
| ☐ 05 Deceit (Misrepresentation) | ☐ 14 Malpractice Legal | ☐ 21 Asbestos |
| ☐ 06 False Accusation | ☐ 15 Malpractice Medical (Including Wrongful Death) | ☐ 22 Toxic/Mass Torts |
| ☐ 07 False Arrest | ☐ 16 Negligence- (Not Automobile, Not Malpractice) | ☐ 23 Tobacco |
| ☐ 08 Fraud | | ☐ 24 Lead Paint |

SEE REVERSE SIDE AND CHECK HERE          IF USED

# Information Sheet, Continued

## C. OTHERS

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10  Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☒ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

## II.

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

## D.  REAL PROPERTY

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

_/s/ Travis Pittman_

**Attorney's Signature**

9/16/2020

**Date**

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

CLEAN LABEL PROJECT FOUNDATION          *

and
                                        *
GMO FREE USA d.b.a. TOXIN FREE USA

                                        *
         Plaintiffs,
                                        *          **2020 CA 004013 B**

       v.                     *          FILED WITH COMPLAINT

                                        *
NOW HEALTH GROUP, INC.

                                        *
        Defendant.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**<u>VERIFICATION</u>**

I, Jaclyn Bowen, verify under penalty of perjury according to the laws of the District of
Columbia that I serve as Executive Director at Clean Label Project Foundation; that I have read
the foregoing Complaint and know its contents; and that the facts stated therein are true to the best
of my knowledge, information, and belief.

<u>   9/15/2020        </u>
       Date

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

CLEAN LABEL PROJECT FOUNDATION          *

and                                      *

GMO FREE USA d.b.a. TOXIN FREE USA       *

          Plaintiffs,              *

                                   *   **2020 CA 004013 B**

        v.                                *   FILED WITH COMPLAINT

NOW HEALTH GROUP, INC.                   *

          Defendant.              *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*
                                   *

## VERIFICATION

I, Diana Reeves, verify under penalty of perjury according to the laws of the District of Columbia that I serve as Executive Director at GMO Free d.b.a. Toxin Free USA; that I have read the foregoing Complaint and know its contents; and that the facts stated therein are true to the best of my knowledge, information, and belief.

Sept. 15, 2020
   Date

Diana Reeves

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

CLEAN LABEL PROJECT FOUNDATION and
GMO FREE USA d.b.a. TOXIN FREE USA    Plaintiff

vs.

NOW HEALTH GROUP, INC.

Defendant

Case Number **2020 CA 004013 B**

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

J. Travis Pittman
Name of Plaintiff's Attorney

P.O. Box 380, Chester, MD  21619
Address

(202) 329-3558
Telephone

*Clerk of the Court*

By _____
Deputy Clerk

Date **09/16/2020**

如需翻译，请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
DIVISIÓN CIVIL
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

CLEAN LABEL PROJECT FOUNDATION and
<u>GMO FREE USA d.b.a. TOXIN FREE USA</u> Demandante
contra

Número de Caso:  **2020 CA 004013 B**

NOW HEALTH GROUP, INC.
<u>                                         </u> Demandado

**CITATORIO**

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o el Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

<u>J. Travis Pittman                        </u>
Nombre del abogado del Demandante

<u>P.O. Box 380, Chester, MD  21619</u>
Dirección

<u>(202) 329-3558                          </u>
Teléfono

*SECRETARIO DEL TRIBUNAL*

Por: <u>                                    </u>
Subsecretario

Fecha <u>**09/16/2020**</u>

如需翻译,请打电话 (202) 879-4828       Veuillez appeler au (202) 879-4828 pour une traduction       Để có một bài dịch, hãy gọi (202) 879-4828

번역이 필요하시면 (202)879-4828 로 연락주십시오       ኣማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

CLEAN LABEL PROJECT FOUNDATION
    Vs.                                    C.A. No.      2020 CA 004013 B
NOW HEALTH GROUP, INC.

## <u>INITIAL ORDER AND ADDENDUM</u>

    Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

    (1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

    (2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

    (3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

    (4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

    (5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

    (6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

                                                     Chief Judge Robert E. Morin

Case Assigned to: Judge FLORENCE Y PAN
Date:  September 16, 2020
Initial Conference: 9:30 am, Friday, December 18, 2020
Location:   Courtroom 415
               500 Indiana Avenue N.W.
               WASHINGTON, DC 20001

CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement.  The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator.  Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/.  To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available.  Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator.  Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W.  Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov.  *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles.  All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.  D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826.  Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch.  The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief   Judge   Robert   E.   Morin

CAIO-60