**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CLEAN LABEL PROJECT FOUNDATION, | |
| Plaintiff, | |
| v. | Case No. <u>21-cv-11-JDB</u> |
| NOW HEALTH GROUP, INC., | Judge John D. Bates |
| Defendant. | |

<u>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO**</u>
<u>**DISMISS**</u>

COMES NOW, Plaintiff, Clean Label Project Foundation ("Plaintiff" or "CLP") and respectfully requests this Court deny Defendant's Motion to Dismiss First Amended Complaint ("FAC"), and states as follows:

## I.   INTRODUCTION

This Court has subject matter jurisdiction over this matter.  Plaintiff is a non-profit as well as a public interest organization who has well-founded statutory standing under §28-3905(k)(1)(D) or §28-3905(k)(1)(C) of the D.C. CPPA.  Plaintiff also has established Article III standing to bring this claim in the D.C Superior Court.  Plaintiff alleges multiple violations of a D.C. consumer protection statute, directly affecting the consumers of the District.  Plaintiff alleges a current, ongoing violation and in doing so, Plaintiff has met all of the elements for organizational standing; both those established by D.C. CPPA, as well as those established by Article III.

Additionally, Federal law does not preempt this claim.  The Doctrine of Primary Jurisdiction does not apply to this matter.  Plaintiff is asking the Court to examine Defendant's false and misleading sale and marketing of the Products under the D.C. CPPA, not to apply, alter, amend or change any federal regulation with regard to contaminants.

## II.  BACKGROUND

CLP has brough suit on behalf of the general public and the class of interested consumers against NOW Health Group, Inc. ("NOW"), alleging NOW's sale of prenatal vitamin products constituted unlawful trade practices under the D.C. CPPA.  Specifically, CLP alleges that the packaging, marketing, and sale of the products misled the public in the District of Columbia into believing that the product were properly formulated, free of contaminants not listed or represented, and superior to other competitive prenatal vitamins. CLP is a non-profit public interest organization, and the sole plaintiff in this action. CLP specifically alleges:

A. Super Nutrition Simply One Prenatal (90 ct):a lead content 125.11ppb, which on a per-serving basis is higher than 56.6% of other prenatal vitamins tested; a cadmium content of 150.51ppb, which on a per-serving basis is higher than78.8% of other prenatal vitamins tested.[1]

B. Super Nutrition Prenatal Blend (180 ct): a lead content of 68.27ppb, which on a per-serving basis is higher than 89.6% of other prenatal vitamins tested; a cadmium content of 130.8ppb, which on a per-serving basis is higher than 96.5% of other prenatal vitamins tested.[2]

---

[1] FAC p. 25-26
[2] *Id.*

C.  Super Nutrition SimplyOne Prenatal (30 ct): a lead content of 143.49ppb, which on a per-serving basis is higher than 62.5% of other prenatal vitamins tested; a cadmium content of 231.57ppb, which on a per-serving basis is higher than 88.6% of other prenatal vitamins tested; a mercury content of 12.87ppb, which on a per-serving basis is higher than 85.2% of other prenatal vitamins tested.[3]

D.  CLP alleges in the FAC that as result of the quantitative testing,[4] the sample of Defendant's Product claimed a label amount of folic acid of 1000mcg/serving, when in fact, the testing results revealed folic acid amount of 737.46/serving, well below the amount indicated on the label and promised to consumer.[5]

On January 15, 2021, Defendant filed a Motion to Dismiss CLP's claims, based on the incorrect arguments that CLP lacked standing to bring its claims because it had suffered no injury-in-fact, no injury to the residents of the District of Columbia and therefore conferred no subject matter jurisdiction to this Court.  Further, Defendant argues the FAC should be dismissed under the Doctrine of Primacy Jurisdiction, as Defendant incorrectly argues Plaintiff's claims are preempted by Federal Law.

### III.  ARGUMENT

### A.  The Statutory History of the D.C. CPPA Affords Plaintiff Statutory Standing.

Defendant's arguments surrounding lack of standing fail to recognize the important and obvious changes to the D.C. CPPA's organization standing provisions as considered in conjunction with traditional notions of Article III standing.  CLP acknowledges that "vindicating the public interest…is a function of Congress and the Chief Executive;" however, false and misleading

---

[3] *Id.*
[4] Said testing was done by an independent ISO-0925 accredited laboratory.
[5] FAC at p. 24

claims are regulated, in the context of this matter, by the D.C. CPPA and enforced by the Court.[6]

In examining Article III standing, Plaintiff agrees it must show that is has suffered an injury-in-

fact; however, it is equally important in the context of injury-in-fact analysis to examine that

standard in conjunction with the organizational standing provisions outlined in the D.C. CPPA.

Most notably, in April of 2013, there was an extensive overhaul of the CPPA's organizational

standing provisions by amendment effective April 23, 2013.  Since the 2013 amendments to the

CPPA took effect, courts have freely found standing for organizational plaintiffs.[7]

 As cited by Defendants, *Grayson v. AT & T Corp.*, 15 A.3d 219 (D.C. 2011), outlines the

Court of Appeals ruling that the CPPA retains an injury-in-fact standing requirement.[8]  However,

read in conjunction with the amendments to the D.C. CPPA, namely, subsequent Bill 19-581,

which overhauled many of the provisions of the D.C. CPPA, it is clear that non-profit organizations

as well as, and in addition to, public interest organizations may act as private attorneys general for

the public under circumstances to ensure the organization has a sufficient state of its own to pursue

the case with appropriate zeal.[9]  Those important clarifications provide the court with a variety of

ways to consider standing options that satisfy the prudential standing principles for non-profit and

public interest organizations acting as private attorneys general, while assuring the courts to be

receptive to other approaches that rely on different means of ensuring a sufficient stake in the

outcomes of the case.

---

[6] *Lujan v. Defs. Of Wildlife,* 504 U.S. 555, 567 (1992) (quoting *Marbury v. Madison, 5 U.S. 137, 170 (1803)).*
[7] *See Organic Consumers Ass'n v. General Mills, Inc.,* No. 2016 CA 6309 B, 2017 D.C. Super LEXIS 4 (July 6, 2017); *National Consumers League v. Gerber Prods. Co.,* No. 2014 CA 008202 B, 2015 D.C. Super. LEXIS 10 (August 5, 2015).
[8] What is noteworthy is that *Grayson* does not hold that Article III prohibits standing sought by suits filed under the D.C. CPPA
[9] Committee on Public Services and Consumer Affairs Memorandum on Bill 19-0581 (hereinafter the "Alexander Report," November 18, 2012) at 2).

**B.**   <u>**Non-profit Entities Have Constitutional Standing to Bring an Action for Misleading the Public.**</u>

Given the above, in 2014, the court issued a written opinion in *National Consumers League v. Bimbo Bakeries United States*, Case No. 2013 CA 006548 B, in which it confirmed not only can a non-profit entity pursue claims arising under the District of Columbia's Consumer Protection Procedures Act ("D.C. CPPA"), but more importantly, clarified that a non-profit entity had constitutional and statutory standing to bring an action against a commercial bakery for allegedly misleading the public with certain product labeling.  Most on point, *Bimbo Bakery* held specifically that a non-profit had standing under both Article III of the Constitution and the D.C. CPPA.[10]

*Bimbo Bakery* further held that, although the D.C. CPPA did not excuse the need to prove constitutional standing, the statute did create certain rights, the impairment of which could constitute an injury-in-fact. Specifically, in accordance with the prior additions to the D.C. CPPA, the Court held that the D.C. CPPA conferred standing on a non-profit as a "private attorney general," as well as a non-profit public interest organization specifically permitted to bring an action seeking relief on behalf of a consumer or class of consumers. D.C. Code § 28-3905(k)(1)(D).

Defendants cite *Beyond Pesticides v. Dr. Pepper Snapple Grp., Inc.,* No. CV 17-1431, 2019 WL 2744685 (D.D.C. July 1, 2019).  This case is clearly distinguishable from *Beyond Pesticides* as in that matter the Plaintiff's allegations were based on one result of trace pesticide residue in one single Motts Applesauce Product.  In the current matter, Plaintiff purchased over 200 products for individual and comparative testing.  Plaintiff tested three (3) products marketed by Defendant.  Those results did not simply yield a trace amount of pesticide residue, which could tangentially be related to D.C. consumers; the testing results showed detectable amounts of lead,

---

[10] *Id.*

cadmium, mercury, the amounts of which, on a per-serving basis, can be as high as 96.5% worse than competitors in the category.[11]  Thus the contamination of three (3)  prenatal products marketed by Defendant, is not only imminently harmful to consumers, but further acts to perceptibly and actually impaired CLP in its mission to provide and educate as to food labeling truth and transparency regarding the marketed Products.

**C.   Defendant has Misrepresented Prenatal Products to a Market of Already Vulnerable Individuals in The District of Columbia.**

Additionally, Defendant does not market these Products as the general vague catch-all "all-natural" as in the Motts products cited to by Defendants in *Beyond Pesticides*.  Defendant markets these Products, along with their other products, as "Science Validated" and "[c]omprehensive, high-potency multivitamins" offer "unequaled value."[12] However, the products marketed contain dangerous neurotoxic heavy metal contaminants. Defendants advertise to D.C. consumers, that "peace of mind" and "physical well-being" through "better nutrition.", directly enticing, encouraging, and targeting D.C. consumers to not only purchase the products but purchase them over Defendant's competitors' products because of their scientific makeup and premiere healthful benefits.[13]  Defendant's website claims to be "Making the World a Better Place Through Better Nutrition is More Than a Slogan, It's Our Mission."[14] Specifically, Defendant focuses on the health and the well-being of the world as its mission in production and distribution of these products.[15]

Thus, Defendant makes direct and pointed mis-assurances on its website and packaging regarding the impact of health and what is in and not in their scientifically formulated Products,

---

[11] Plaintiff's FAC ¶126(a) *et seq.*
[12] FAC at 9 and 111.
[13] Plaintiff's FAC at 109-118.
[14] *Id.* at 110.
[15] *Id.* at Figure 7

damaging the exact aim and mission of CLP's work. Consumers in the District have relied on not just the labels but the overall marketing misrepresentations to their detriment and to the detriment of the growing fetus, the very reason for the existence of the products.

This is not just a generalized grievance on behalf of the general public; this is a Defendant who has misrepresented one of the most crucial prenatal items to a market of already at-risk individuals in the District of Columbia.  A market that CLP, a non-profit *and* public interest organization, has a long-standing focus and mission to serve, educate, and protect, and a market that is being directly and harmfully impacted by Garden of Life's misrepresentations.

Thus, *Beyond Pesticides,* a non-profit corporation, that relied on only D.C. Code § 28-3905(k)(1)(C), to provide standing through the "general public" for a violation involving one single consumer product with a trace amount of a pesticide is incredibly different from the case at bar. Additionally, Plaintiff here not only has Article III standing and statutory standing under § 28-3905(k)(1)(C), but also has standing under § 28-3905(k)(1)(D).

**D.**  **Plaintiff Here Possesses Standing Under Either of The Two Amendments §**
    **28-3905(k)(1)(D) or § 28-3905(k)(1)(C).**

**a.  § 28-3905(k)(1)(D)**

D.C. Code § 28-3905(k)(1)(D) allows a public interest organization to bring any action that a consumer could bring under (k)(1)(A), so long as the organization has a sufficient nexus to the consumer's interests to represent those interests adequately:

> (i) Subject to sub-subparagraph (ii) of this subtitle, a public interest organization may, on behalf of the interests of a consumer or class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action under subparagraph (A) of this paragraph for relief from such use by such person of such trade practice.
> (ii) An action brought under sub-subparagraph (i) of this subparagraph shall be dismissed if the court determines that the public interest organization does not

have sufficient nexus to the interests involved of the consumer or class to adequately represent those interests.

Accordingly, § 28-3905(k)(1)(D) allows public-interest organizations, like CLP, with a nexus to consumer interests to bring an action for relief when untruth enters the marketplace to consumer detriment, regardless of whether the organization itself suffers the informational injury, or would have standing under federal precedent. Thus, § 28-3905(k)(1)(D) is intended to, and does, recognize organization standing beyond prior reliance on federal Article III cases.

It follows that, if NOW has caused misrepresentations or omissions of material fact to enter the D.C. marketplace, the only question relevant to standing under D.C. Code § 28-3905(k)(1)(D) is whether Plaintiff is a public-interest organization as defined in D.C. Code § 28-3901(a)(15), and whether Plaintiff "ha[s] sufficient nexus to the interests involved of the consumer or class to adequately represent those interests."

Pursuant to D.C. Code § 28-3901(a)(15), a public-interest organization is a "nonprofit organization that is organized and operating, in whole or in part, for the purpose of promoting interests or rights of consumers." As outlined in the FAC, CLP is both a non-profit and public interest organization with a defined mission to enable consumers to make informed shopping choices based on food labeling truth and transparency.

A public-interest organizational Plaintiff, such as CLP, has "sufficient nexus to the interests involved of the consumer or class to adequately represent those interests." D.C. Code § 28-3905(k)(1)(D)(ii). Plaintiff, CLP, was founded with the mission of reducing contamination in consumer products and aims to educate consumers on how to make informed choices.

Given the above, so long as the FAC sufficiently alleges deception in the D.C. marketplace, the requirements of § 28-3905(k)(1)(D) standing are met. As stated in Plaintiff's FAC, Defendant's adulterated Product is exposing mothers and their babies to contaminants, to include lead,

cadmium and mercury, compounds known to cause reproductive harm in fetuses and infants. The negative effects of contaminants in prenatal vitamins has a direct impact on the D.C. consumer. As a result, D.C. consumers bear the risk of purchasing a product that contains toxic heavy metals, which are extremely dangerous to the fetus. More egregious, is the under-formulation of the product marketed by NOW. The very point of a prenatal vitamin is to provide folic acid, when NOW misrepresents the amount of folic acid and/or folate, regardless of federal standards, it makes label promises that are false and misleading to consumers who are purchasing the product entirely in reliance on said promise.

Consistent with the ruling in *Grayson,* the mislabeling of the Products and the void of any mention of the contaminants and/or neurotoxins therein, is the causal connection between the damage done during the prenatal development process and the conduct alleged in CLP's FAC. Secondarily, NOW produces Products that are sold to Consumers through retail stores (to include within the District of Columbia), and online - the presence of these contaminants directly affects the consumer, the general public, of the District of Columbia. D.C. consumers are enticed to purchase these Products over the products of NOW's competitors based on these label claims. The potentially harmful label claims go directly to the core of CLP's mission, which is food labeling truth and transparency, neither of which is present in Defendant's labeling nor marketing of the products. This ambiguity in labeling and correlating contamination is directly harmful to the D.C. consumer and to the class of consumers for which CLP brings suit.

Accordingly, Plaintiffs have adequately alleged that they are in the class of plaintiffs who have a statutory right to bring CPPA action. Thus, the deprivation of that right constitutes an injury in fact that is sufficient to establish standing, even, arguendo, if the Court would find Plaintiff has not suffered a judicially cognizable injury in the absence of the statute.

### b.  Plaintiffs Have Statutory Standing Pursuant to § 28-3905(k)(1)(C)

Defendant has neglected to address that CLP has filed suit under multiple provisions of the CPPA.  Notably, CLP also has standing under the comparably narrower provisions of D.C.  Code § 28-3905(k)(1)(C) which provides:

> A nonprofit organization may, on behalf of itself of any of its members, or on any such behalf and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District, including a violation involving consumer goods or services that the organization purchased or received in order to test or evaluate qualities pertaining to use for personal, household or family purposes.

Subsection 28-3905(k)(1)(C) makes two important clarifications. First, § 28-3905 (k)(1)(C) overrides precedent that would otherwise preclude "manufactured standing" from constituting injury-in-fact.

New subsection 28-3905(k)(1)(B) provides a right of action for consumers who act as product or service testers.  Such consumers need not actually have been misled by a misrepresentation regarding a consumer good or service to have suffered an injury in fact giving rise to an actionable claim.

Second, as to the other forms of organization standing § 28-3905(k)(1)(C) directs courts to err on the widest side of the D.C. decisions interpreting organizational standing, even as they may change in the future.  CLP bring this suit on behalf of both its members and the general public, possess "tester" standing under § 28-3905(k)(1)(C) because CLP caused the purchase the products for the purposes of testing for purity.

Given the above, CLP has demonstrated an injury-in-fact sufficient to confer standing under both Article III and the D.C. CPPA.

## IV.   FEDERAL LAW DOES NOT PREEMPT THIS D.C. CPPA CLAIM

### A.   <u>Plaintiff's FAC is Filed Under the D.C. CPPA, Which Asks the Court to Determine Whether Defendant Has Engaged in Deceptive Labeling, Marketing and Sale of Defendant's Products.</u>

Defendant argues that the Food, Drug, & Cosmetic Act ("FDCA"), 21 U.S.C. 343-1(a) preempts Plaintiff's CPPA claim.  This argument has been attempted and rejected multiple times.[16] Defendant's assertion that CLP's allegations are based on alleged failures to meet *federal* standards concerning whether the dietary supplement Products at issue are illegally labeled and adulterated is inaccurate.  Defendant has again attempted to unilaterally rewrite the Plaintiff's FAC  to suit its goal of dismissal.[17] However, Plaintiffs are masters of their own pleading. *See e.g., US Airways Master Exec. v. American W. Master Exec. Council,* 525 F. Supp. 2d 127, 135 (D.D.C. 2007).  The FAC challenges not safety or federal tolerance levels, but the representation and misrepresentations made through a marketing campaign that the vitamins are superior, when in fact, they are not.  Because CLP's claims do not merely challenge the language on Defendant's prenatal Product labels, the FDCA and DSHCA do not expressly preempt them. The Federal Trade Commission (FTC) has explained, because consumers react  differently  to  labeling  and advertising, even "claims that would technically comply with ... labeling regulations might be deceptive in advertising if the context of the ad renders the express message of the claim

---

[16] *See, e.g. Ben & Jerry's,* 2019 D.C. Super LEXIS 1 (environmental responsibility claims about ice cream contaminated with glyphosate residue); *General Mills,* 2017 D.C. Super. LEXIS 4 (snack bars labelled "100% Natural Whole Grain Oats" but contaminated with glyphosate residue); *Bimbo Bakeries,* 2015 D.C. Super LEXIS 5 (confusion based on "whole wheat" and "whole grain" break marketing practices); *National Consumers League v. Doctor's Assocs. Inc.,* No. CA 006549 B, 2014 D.C. Super LEXIS 15 (whole-grain claims).

[17] Defendant argued in its Notice of Removal, where it insisted this matter belonged under federal jurisdiction, that Plaintiff's FAC should be read as a class action under CAFA despite there being no mention of CAFA in  the FAC and the fact that it was cited and filed under the D.C. CPPA. Defendant now argues the inverse argument, that the complaint is really a preempted and should be dismissed from federal court.

misleading."[18] Because labeling and advertising are distinct forms of communication, often regulated separately, state-law claims alleging false or misleading advertising present no obstacle to federal oversight of prenatal product marketing.

Additionally, whether Defendant's Products contain impermissible levels of contaminants is but one consideration in determining the degree to which Defendant has knowingly or recklessly engaged in deceptive labeling and marketing practices, and such a factor may be reviewed through the standard(s) set forth by said agencies. Similar to the ruling in *Ben & Jerry's, supra,* "It is difficult to imagine that the suit would have any effect on the federal government's ability to set acceptable levels of glyphosate consumption." Here, CLP is not asking challenge any levels of toxins or definitions of "adulteration." Plaintiff's FAC is filed under the D.C. CPPA, which asks the Court to determine whether, as a whole, Defendant has engaged in deceptive labeling, marketing, and sale of Defendant's Products.

Defendant cites *Gibson v. Quaker Oats Co,* 2017 WL 3508724, *4 (N.D. Ill. Aug. 14, 2017), which, in part, erroneously misquoted 21 U.S.C. §343-1 as "no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce." 2017 U.S. Dist. LEXIS 130696 at 11. However, 21 U.S.C. §343-1 goes on to say that only state requirements "not identical" to certain enumerated federal requirements are preempted—making the *Gibson* decision not applicable to the point.

### B. Plaintiff's FAC Does Not Reference Federal Regulations and Presents Plausible Claims Under the D.C. CPPA.

Defendant argues for preemption that "FAC's plethora of allegations that NOW's Products are "adulterated" dietary supplements – as expressly defined in 21 U.S.C. § 342(f)(1).[19] Defendant

---

[18] FTC, Enforcement Policy Statement on Food Advertising (May 13, 1994), https://www.ftc.gov/public-statements/1994/05/enforcement-policy-statement-food-advertising.
[19] Defendant's Motion to Dismiss, p.13.

goes on to assert "Every facet of CLP's cause of action is predicated on the allegation that NOW's Products are adulterated. FAC page 1-2 & ¶¶ 14-16, 69, 90, 107, 109, 116, 130, 133, 136, 140, 148, 150. The success or failure of CLP's claims turns on establishing whether NOW met federal standards."[20]  However, that is an incomplete and inaccurate reference.  Representations at issue in this case are not label representations of "adulteration", they appear on the packaging, advertising methods, website, and so forth, as part of Defendant's widespread campaign to capture the very specific market for the Products. Defendant then erroneously concludes that "Further, without the allegations of adulteration, CLP would not include "enough facts to state a claim to relief that is plausible on its face." Again, similar to *Ben & Jerry's,* the FAC is focused not on specific forms, but on advertising references as a whole.[21]

Further, the  Court in *Bimbo Bakeries,* also addressed the similar issue when it found "NCL's CPPA claims against BBUSA concern BBUSA's overall marketing practices of which product names are only a part."[22]  Reference to said tolerances is void from CLP's FAC and are entirely unnecessary and would distract from the point of the FAC, which is not to demand reformulation of Defendant's Products based on a federal standard but to call for a determination that Defendant has engaged in deceptive labeling, marketing, and sale of said Products.

Generally speaking, whether Defendant's marketing and representations misleads consumers is a question of fact, inappropriate for determination on a motion to dismiss.  *See e.g. Doctor's Assocs.* 2014 D.C. Super. LEXIS 15 at 16 (holding that whether marketing strategy employed by company does, in fact, make representations about "characteristics" or "ingredients" is issue of fact, appropriately resolved at trial, not on motion to dismiss).  Nonetheless, Defendant

---

[20] *Id.*
[21] *Ben & Jerry's* at 9.
[22] *Bimbo Bakeries*  at 19.

argues that CLP's  FAC should be dismissed, eliminating CLP's ability to have a day in court, because it is implausible that reasonable D.C. consumers of prenatal vitamins could believe that given the overall marketing scheme, Defendant's prenatal Products are "safer and better nutrition," contain the promised amounts of folic acid/folate, and are a superior product free from residues of toxins and other chemicals.

As the FAC states, Defendant's know that the marketing "safer" and "better" convey concepts that matter to prenatal consumers, otherwise those terms and references would not be present on the marketing materials. The FAC cites survey evidence and articles that suggest that "A reasonable D.C. consumer would not expect products claiming to support "brain health" to  contain high levels of neurotoxins and to be under-formulated for folic acid/folate."[23]  Thus, by representing the Products as "safer" and "better" when it allegedly contains heavy metal toxins and is under-formulated as to folic acid/folate, Defendant mislead consumers seeking to purchase a prenatal product that was "safer" and "better," and Plaintiff's FAC has alleged enough facts to survive a motion to dismiss.

Plaintiff also cites "In a census-balanced survey commissioned by CLP of 630 mothers who took prenatal vitamins during pregnancy, eighty-three percent (83%) felt that they would not have purchased the products if they had discovered it was under-formulated and eighty-four percent (84%) of moms would want their money back."  Clean Label Project, Independent Study of Prenatal Vitamin Consumer Insights (June 25, 2020) (unpublished study) (on file with Clean Label Project).[24]  Additionally, CLP cited that "peer-reviewed research has demonstrated that

---

[23] FAC at 13
[24] *See also, Hughes v. Ester C Co.,* 330 F.Supp 3d. 862, 872 (E.D.N.Y 2018) (To satisfy the reasonable consumer standard, a plaintiff must adduce extrinsic evidence—ordinarily in the form of a survey—to show reasonable consumers interpret the challenged claims). *Bimbo Bakeries,* (By pointing to studies about consumer's expectation about the whole grain content and statistics showing a growth in consumer demand for whole grain products, NCL provides sufficient evidence which suggests that ha reasonable consumer would attach importance to the whole grain content in making a decision to purchase bread products).

folate/folic acid supplementation during pregnancy can reduce the risk of spontaneous abortion or still birth."[25]  For this reason, supplementing with folate/folic acid is an important step in prenatal neurodevelopment."[26] Moreover, CLP cites studies that have confirmed that getting an adequate amount of folic acid will protect the fetus/infant from NTDs by at least fifty percent (50%).[27] Thus, considering the entire FAC as plead, the use of "safer" and "better" with regard to this market is of utmost importance to the consumers and provides sufficient evidence which suggests that a reasonable consumer would attach importance to marketing content in making a decision to purchase prenatal products.

Further, Defendant does not deny that the chemicals and toxicants listed in Plaintiff's FAC are present in the Products at issue and are thus being ingested by expectant mothers. Hence, as agreed by both Plaintiff and Defendant, in the most literal sense, mothers and fetuses are being "exposed" to said chemicals, irrespective of the levels. Here, Defendant's Products are sold to a particularly vulnerable group who rely on prenatal vitamins to assist in the healthy development of fetuses. Thus, Defendant's advertising and marketing is particularly deceptive given that the very point of a prenatal vitamin is to ensure the safety of neurological development of a fetus and yet contains chemicals that would do just the opposite.[28]

---

[25] Gaskins, A. J., Rich-Edwards, J. W., Hauser, R., Williams, P. L., Gillman, M. W., Ginsburg, E. S., ... & Chavarro, J. E. (2014). Maternal prepregnancy folate intake and risk of spontaneous abortion and stillbirth. Obstetrics and gynecology, 124(1), 23.
[26] FAC at 57-58.
[27] CDC, Preventing Neural Tube Defects: A prevention Model Resource Guide (July 17, 2020), https://www.cdc.gov/ncbddd/orders/PDFs/09_202063A_Nash_Neural%20Tube%20BD%20Guide%20FINAL508.pdf%20(wed).
[28] Defendant spends multiple pages touching on the regulations laid forth by the FDA and other regulatory agencies but fails to mention, as noted in Plaintiff's FAC, that the Environmental Protection Agency, Food and Drug Administration, the World Health Organization, Centers for Disease Control and Prevention, the American Medical Association, and the American Academy of Pediatrics have all independently stated that there is *no* safe level of lead for children. Plaintiff's FAC, p. 4.

C. **Defendant's Packaging and Website Mislead the Consumers Given the Disparity Between the Levels of Contaminants Present in Defendant's Products and Those of its Competitors.**

Rather than focus on permissible standards as set forth in the FDCA and DSHCA of levels of contaminants in products, CLP also focuses on the practices of Defendant's competitors in connection to an argument of superiority. Just one example of the vast discrepancy in toxicant levels between Defendant's Products and those of its competitors is Defendant's Super Nutrition Prenatal Blend (180 ct) Product that contains 130.88 ppb of cadmium, which on a per-serving basis is higher than 96.5% of other prenatal vitamins tested.[29]   Thus, it would be more than reasonable to assert that, even if consumers of Defendant's prenatal products believed them to possess some levels of deleterious substances, they would certainly not expect such a level that is above nearly every other tested product in the prenatal vitamin category. Thus, Defendant's packaging and website, which lead the consumer to believe that, at a minimum, the quality of their Products is the same or better than other similar products, mislead the consumer given the grand disparity between the levels of contaminants present in Defendant's Products and those of its competitors. Further, it would not be a stretch to argue that Defendant's marketing, labeling, and advertising, created for the very purpose of enticing the consumer to choose its Products over those of others, deceives the consumer to believe that the Products are even more healthful and contain even fewer deleterious substances than those of its competitors.

D. **The Doctrine of Primary Jurisdiction Should Not Be Applied to This Matter.**

Defendant refers to *Total Telecomms. Servs., Inc. v. AT&T* that states that the doctrine of primary jurisdiction is "premised on a desire for uniform outcomes and on the inherent advantage in allowing an agency … to apply its expert judgement to the issues in dispute." 919 F. Supp. 472,

---

[29] FAC at 126(b)

478 (D.D.C. 1996). Defendant misapplies both case law and the doctrine of primary jurisdiction given that Plaintiff is not asking the Court to decide on an issue that has been decided by a federal agency. Rather, Plaintiff is asking the Court to apply the D.C. CPPA in determining an issue that is not covered by a federal regulatory agency. None of the regulations referred to in Defendant's Motion to Dismiss discuss when an entity may make affirmative statements on the quality, purity, or superiority of a product that is in direct conflict with the actual quality of the Products. Such an issue is covered under the D.C. CPPA in addressing misleading and deceptive marketing practices. Thus, the D.C. CPPA should apply, and primary jurisdiction does not.

Additionally, the doctrine of primary jurisdiction is irrelevant and should not be applied given that Plaintiff's FAC merely asks the Court to determine whether Defendant has violated a statute dealing with misleading or false advertising and marketing practices, not whether the levels of contaminants present in Defendant's Products are allowable, an issue Plaintiff acknowledges has already been determined by federal agencies.

Defendant is attempting to mislead the court into believing that 1) determining whether Defendant has violated the D.C. CPPA cannot be made without first determining what levels of the contaminants in question are allowable and 2) that Plaintiff is calling for the Court to determine novel permissible levels of contaminants. Determining permissible levels of contaminants in a given product is merely one factor among many that the Court can consider in determining the degree to which Defendant has violated the D.C. CPPA, and Plaintiff is not asking the Court to make a separate determination on the matter.

Defendant mentions four factors that Courts consider in determining whether to abstain under the doctrine of primary jurisdiction: "(1) whether the question at issue is within the conventional expertise of judges; (2) whether the question at issue lies particularly within the

agency's discretion or requires the exercise of agency expertise; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made."[30] Although such consideration is irrelevant to this case, even if the four factors were applied here, the doctrine of primary jurisdiction would still not apply.

As to the first and second factor, the issue is whether Defendant's statements made on its packaging and website were misleading to consumers and in violation of the D.C. CPPA, and a determination of such is within the exact expertise of judges. Merely because a federal agency's regulation(s) may be taken as a factor in determining the question at issue doesn't mean that the issue itself falls within the expertise of an agency and not a judge. With respect to the third factor, there is virtually no danger of inconsistent rulings given that Plaintiff, contrary to Defendant's assertions, is asking the Court to apply an existing statute, the D.C. CPPA, that has set forth clear standards. Defendant states that "Different courts or judges could reach differing conclusions regarding the regulatory, safety and science issues that the FAC raises."[31]  Again, what level of a given substance in a Product is permissible is not a determination Plaintiff is asking the Court to determine.

Finally, the fourth factor, whether a prior application to the agency has been made, is not relevant given that Plaintiff is not asking the Court to decide an issue that can alternatively be solved through an application to a federal agency, like the FDA. Plaintiff is asking the Court to enforce D.C. CPPA, not a federal regulation. Thus, the doctrine of primary jurisdiction does not apply, and this case should continue under the discretion of this Court, applying the D.C. CPPA.

---

[30] Defendant's Motion to Dismiss, p. 14.
[31] *Id* at p. 14

## V.    CONCLUSION

Plaintiff has standing under both Article III of the U.S. Constitution as well as statutory standing via both as a public interest organization under § 28-3905(k)(1)(D) and a non-profit organization under § 28-3905(k)(1)(C) of the D.C. CPPA.  Plaintiff has established a causal connection between the actions of Defendant and the consumers of the District of Columbia, as Defendant is marketing a prenatal vitamin product that is plagued with multiple contaminants, to include neurotoxins, known to cause significant and tangible reproductive harm, and is under formulated.  In doing so, Defendant has directly harmed the mission of CLP to educate and inform the consumers of the District as to data-based decisions regarding the superiority and quality of the Product alone, as well as comparative to other prenatal vitamins.

Secondarily, Federal law does not preempt this claim.  CLP's FAC is focused on advertising references as a whole.  These claims and references go to the overall marketing practices of which product contents and labeling are only a part.

Finally, the doctrine of primary jurisdiction should not be applied as CLP's FAC is filed under the D.C. CPPA, which asks the Court to determine whether Defendant has engaged in deceptive labeling, marketing, and sale of Defendant's Products, and not to determine whether the Defendant is in violation of a federal regulatory standard.

**WHEREFORE**, Plaintiff Clean Label Project Foundation respectfully requests Defendant NOW Health Group's Motion to Dismiss be **DENIED.**

Dated: January 29, 2021

Respectfully submitted,

Attorneys for Clean Label Project (CLP)

/s/ Travis Pittman
_____

Travis Pittman (D.C. Bar No. 1016894)
Counsel for Plaintiff
Holmes Pittman & Haraguchi, LLP
P.O. Box 380
Chester, MD  21619
Phone: (410) 482-9505
Fax: (443) 782-0362
jtpittman@hphattorneys.com

Kristen M. Ross, Esq.
Davitt, Lalley, Dey & McHale, PC
1971 Beltline Ave., Suite 106
Grand Rapids, MI 49525
Tel: (202) 750-0355
kristen.ross@dldmlaw.com

**Certificate of Service**

I hereby certify that on this 29th day of January, 2021, I served the foregoing *Plaintiff's Response in Opposition to Defendant's Motion to Dismiss* on all parties via the Court's electronic case filing system.

/s/ Travis Pittman
_____
Travis Pittman